NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0327n.06

No. 22-1588

**FILED**

Jul 17, 2023

DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DALE THRUSH,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

---

Before: **CLAY, WHITE, and THAPAR, Circuit Judges.**

WHITE, J., delivered the opinion of the court in which THAPAR, J., joined. CLAY, J. (pp. 13–33), delivered a separate dissenting opinion.

**WHITE, Circuit Judge.** Defendant Dale Thrush appeals the district court's denial of his motion to dismiss the charges against him, asserting that the district court improperly declared a mistrial in violation of the Double Jeopardy Clause of the Fifth Amendment. We **AFFIRM.**

**I.**

Thrush owned and operated several businesses, including 402 N Mission St, LLC, which provided employer-related payroll services. A grand jury indicted Thrush in August 2020 on ten counts of failing to pay payroll taxes, in violation of 26 U.S.C. § 7202, and four counts of failing to file a tax return, in violation of 26 U.S.C. § 7203. The indictment alleges that Thrush failed to pay the IRS $238,223 in payroll taxes that 402 N Mission withheld from employees' wages from 2014 to 2016.

From 2007 through 2016, Thrush employed Donna Henke as his bookkeeper. Both Thrush and the government subpoenaed Henke to appear for trial and listed her as a witness. Henke was expected to testify that she prepared bookkeeping entries for Thrush from 2014 through 2016 and that Thrush instructed her to pay third-party and personal expenses from 402 N. Mission bank accounts, and not to make payroll-tax payments that were due to the IRS.

On November 3, 2021, the day before trial was scheduled to begin, Henke, who was fully vaccinated, informed the government that she had tested positive for COVID-19 on a rapid test but was asymptomatic. She took a polymerase-chain-reaction ("PCR") test the same day and was waiting for the results. The government failed to share this information with the court or defense counsel.

On November 4, a Friday, the district court impaneled a jury and began trial. Both the government and defense counsel referred to Henke's testimony in their opening statements. The government asserted that "you'll hear about the various stories that the defendant gave to the IRS as to why he didn't or wouldn't pay over the payroll tax he owes," including that he "blam[ed] one of his bookkeepers." R.102, 1535. Defense counsel referred to Henke by name extensively and argued that Henke's poor bookkeeping caused the failure to make payments. After opening statements, the government presented testimony from several witnesses and then the district court adjourned the trial until Monday morning.

On November 5—the Saturday after the first day of trial—Henke informed the government that she received a positive result on the PCR test. At that point, the government informed the court and defense counsel that Henke had tested positive for COVID-19.

On Sunday, November 6, the government filed a motion seeking leave to present Henke's testimony through alternative means. First, the government asked the court to "permit live, two-way videoconference testimony of [Henke]." R.55, PID 474. Specifically, the government sought permission for Henke to "testify from a public parking area adjacent to the relevant federal courthouse via videoconference (while seated in a covered canopy tent area) with the defendant and defense counsel present (at a safe distance and seated in folding chairs at a foldable 6-foot banquet table) and defense counsel able to cross-examine D.H." *Id.* at PID 478–79. Alternatively, the government asked the court to authorize a video deposition of Henke that would be shown to the jury before the conclusion of the government's case. Thrush objected to these proposals on Confrontation Clause grounds.

On Monday morning, the court convened a telephone hearing to address the government's motion. The court briefly summarized the government's motions and Thrush's opposition to those motions. The court then explained that two additional circumstances had arisen over the weekend: 1) a juror had reported that her son had the flu and she could not leave her residence; and 2) the judge's spouse tested positive for COVID-19, although the judge had tested negative on a rapid test. The court laid out two alternatives: it could adjourn the trial until November 30, the next available date on the court's calendar; or it could "simply mistry the case and re-calendar it for attention a little bit later in 2022." R.60, PID 510-11.

Thrush's counsel immediately rejected the court's mistrial suggestion. He explained that "[i]t is our position that if we mistry this case, then we cannot bring it back without violating the [D]ouble [J]eopardy [C]lause of the Constitution because the prosecution knowingly took [the] risk" that Henke would be unavailable to testify when they learned of her positive rapid test result. R.60, PID 511. The court then asked the government, "what's your assessment of the alternative

of proceeding on November the 30th or simply mistrying the case and beginning it again in 2022?" *Id.* at 513. The government agreed to adjourn the trial until November 30, 2021. Thrush's counsel then objected to the adjournment, expressing concern that Thrush would be prejudiced because a delay would "give the jury three weeks to look stuff up on the internet and talk to their friends and families and be influenced by outside decisions." *Id.* at 513.

The court determined that the "easiest thing to do" would be to "at least poll the jury to see the extent to which an extended adjournment to November the 30 is feasible" and added, "[i]f it isn't [feasible] my intention will be to declare a mistrial." *Id.* at 514. The judge then appeared before the jury by Zoom to poll the jurors regarding their ability to resume jury service on November 30th. Five jurors reported possible conflicts:

- Juror 12 answered "I will actually be in Mexico that week for a friend's wedding" and said his flight arrangements and other bookings were already made.

- Juror 11 answered "my husband has upcoming appointments that he really needs me to go with him on." The court asked if these were medical appointments and Juror 11 confirmed that the husband "sees a psychologist."

- Juror 6 answered "I start a new job on the 15th working for the state government, so I can't really miss any days of work."

- Juror 4 answered "I have OB testing that week."

- Juror 14 answered "I have stuff in December that went further with my daughter that plays travel basketball, which we have hotels and everything up in the UP, just that we already have scheduled, but I could rearrange it, but I do—I would like to see her games, if possible."

*Id.* at PID 517-519.

The court then excused the jury and asked for "any brief remarks from the Government." *Id.* at 519. The government stated that "it appears more than three of the jurors have conflicts with returning on November 30th" and "[t]hat means with the—even with the two—three alternates, I don't think we have enough for a full panel." *Id.* at 519-20. In response, the court stated "I would

agree. My belief is at this point we need to mistry the case. The Government agree or disagree?" *Id.* at 520. The government agreed and explained that mistrial was necessary based on "jury unavailability to return." *Id.* Thrush's counsel stated, "Defense agrees with the mistrial, You Honor, but our position remains with respect to the jeopardy." *Id.*

Before adjourning, Thrush's counsel asked, "is the reason that we're mistrying the case [] because the jury isn't available as opposed to you not being available?" *Id.* at 520. The court explained that the mistrial was due to a "confluence of factors." *Id.* Then the government asked

> Just to clarify the basis for the mistrial, my understanding, it is a confluence of circumstances that includes the illness of the witness, DH, your exposure to a COVID-positive person, and the impracticability of continuing the case to November 30 because some of the jurors are not available. Are those all the factors?

*Id.* at 521. The court answered, "[c]orrect, yes." *Id.* The following week, the district court issued an order declaring a mistrial, denying the government's motion to present video testimony of Henke as moot, and setting a new trial date "on the earliest practicable date." R.61, PID 525.

In December 2021, Thrush moved to dismiss the indictment on double jeopardy grounds. He primarily argued that the Double Jeopardy Clause barred retrial and that Henke's unavailability did not provide "manifest necessity" for a mistrial. R.64, PID 540. Thrush also highlighted that the court "acknowledged that the Judge could conduct the trial via video or a magistrate could conduct the trial." *Id*. at 542. In a separate motion, Thrush moved to disqualify the government's prosecutors based on their failure to disclose Henke's initial rapid-test results.

The district court denied both motions. The court reasoned that there was "manifest necessity" for the mistrial and Henke's unavailability was only "one of several reasons for the

mistrial." R.96, PID 1505. The district court also denied Thrush's motion to disqualify the prosecutors.

Thrush timely appealed the district court's denial of both motions.[1]

## II.

Although our jurisdiction is usually limited to appeals from final judgments,"[a]n order denying dismissal on double-jeopardy grounds lacks finality, but is appealable under the collateral-order doctrine provided the claim is 'colorable.'" *United States v. Willis*, 981 F.3d 511, 514 (6th Cir. 2020) (quoting *Richardson v. United States*, 468 U.S. 317, 322 (1984)). The district court determined that Thrush's claim is colorable and we agree.

## A.

Our review of a district court's denial of a motion to dismiss an indictment on double jeopardy grounds is de novo. *United States v. Koubriti*, 509 F.3d 746, 748 (6th Cir. 2007). The Fifth Amendment to the United States Constitution requires that no person be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Jeopardy attaches to a criminal defendant when the jury is impaneled and takes its oath. *United States v. Young*, 657 F.3d 408, 416 (6th Cir. 2011). And "[b]ecause jeopardy attaches before judgment becomes final, the constitutional protection" against double jeopardy "also embraces the defendant's 'valued right to have his trial completed by a particular tribunal.'" *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). So, under normal circumstances, the government cannot re-try a criminal defendant if the defendant's trial ends before a final judgment but after the jury has been impaneled and taken its oath.

---

[1] Because Thrush's briefing addresses only the double jeopardy issue, we consider the disqualification issue forfeited.

However, the prohibition against double jeopardy is not an absolute bar to retrial in all circumstances. *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982). Because of the variety of reasons

> that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, [the criminal defendant's] valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.

*Arizona*, 434 U.S. at 505. Accordingly, when a trial is terminated over the objection of the defendant, "retrial is permissible when 'manifest necessity' requires it." *Walls v. Konteh*, 490 F.3d 432, 438 (6th Cir. 2007) (citing *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824)).

A mistrial may not be declared without due consideration of the defendant's Fifth Amendment rights. We review a mistrial in a criminal case on a "sliding scale of scrutiny" to determine whether it was justified by "manifest necessity." *Colvin v. Sheets*, 598 F.3d 242, 253 (6th Cir. 2010) (citing *Ross v. Petro*, 515 F.3d 653, 669 (6th Cir. 2008), *cert denied* 555 U.S. 1099 (2009)). The "strictest scrutiny applies when the mistrial is based on prosecutorial or judicial misconduct," *id.*, and "the most relaxed scrutiny" is due when the mistrial is based on a deadlocked jury or circumstances "akin to a deadlocked jury situation (i.e., where fault is not attributed to a party, counsel or the judge)," *Ross*, 515 F.3d at 661, 669. In determining the proper level of scrutiny, we consider "whether the underlying reasons for the mistrial concern issues best left to the informed discretion of the trial judge or issues that resemble pure questions of law for which closer appellate review is appropriate." *United States v. Stevens*, 177 F.3d 579, 583 (6th Cir. 1999).

Here, several factors were involved, ranging from COVID exposures to juror availability and the feasibility and lawfulness of a remote trial. To the extent that typical calendar constraints guided the judge's decision, ordinary abuse-of-discretion scrutiny arguably applies. However, at least one of the factors confronting the judge—his COVID exposure—was outside the judge's and

the parties' control. Decisions regarding such matters ordinarily receive the "most relaxed scrutiny." *Ross*, 515 F.3d at 661. Either way the result is the same. Therefore, rather than resolve this question, we assume that ordinary deference applies and review the mistrial order to ensure that "the trial judge exercised 'sound discretion.'" *Washington*, 434 U.S. at 514.

**B.**

As Judge Clay correctly observes in his dissent, the district court's first reason for a mistrial, Henke's unavailability, should not have figured in its reasoning at all. Although the district court determined that no bad faith was involved, Henke's unavailability after jeopardy attached was solely the fault of the government—the prosecutors knew that Henke had tested positive for COVID-19 on a rapid test on November 3, 2021, in advance of jury selection on November 4, 2021, and elected to keep that information to itself until Henke received a positive PCR test result after the first day of testimony. To be sure, the district court had discretion to grant an adjournment if practicable, but Henke's unavailability does not qualify as "manifest necessity" justifying a mistrial given that the government unilaterally took the risk that Henke might not be available to testify after the jury was selected. Thus, it was an abuse of discretion to factor Henke's unavailability into the mistrial determination. *Cf. Downum v. United States*, 372 U.S. 734, 737 (1963) (holding that the prohibition against double jeopardy barred retrial where a jury was discharged "because a prosecution witness had not been served with a summons and because no other arrangements had been made to assure his presence."); *Arizona*, 434 U.S. at 508, n.24 (explaining that when "a prosecutor proceeds to trial aware that key witnesses are not available to give testimony and a mistrial is later granted for that reason, a second prosecution is barred").

But the district judge's unavailability due to his wife having COVID-19 was a sufficient neutral justification for at least adjourning the trial until November 30th. At the time of Thrush's trial, the Eastern District had issued instructions that anyone "exposed within the last ten days" to COVID-19 was "NOT PERMITTED TO ENTER THE COURTHOUSE." R.74-4, PID 1202. There is nothing in this policy that suggests a negative-test exception or contemplates a district judge consulting the chief judge about obtaining such an exception. Requiring district judges to coordinate with their chief judges to skirt official courthouse policy during a nationwide pandemic is inconsistent with the "inherent authority, and even 'grave responsibility,' to determine what safety measures are necessary to protect the judge, court personnel, the parties, the lawyers, the jurors, and the audience in and around the courtroom." *United States v. Smith*, No. 21-5432, 2021 WL 5567267, at \*2 (6th Cir. Nov. 29, 2021) (quoting *Morgan v. Bunnell*, 24 F.3d 49, 51 (9th Cir. 1994)). The district court's implicit assumption that it was bound by Eastern District guidelines on COVID-19 exposure is a determination to which we owe deference. The district court did not abuse its discretion by following Eastern District policy.

The district court's decision to explore adjournment rather than request a substitute judge or proceed remotely was also not an abuse of discretion. Because Thrush was being tried for a felony, a magistrate judge could not preside over the trial. *Gomez v. United States*, 490 U.S. 858, 872 (1989). And because the district judge was the only district judge in the Bay City courthouse, any substitute judge would have had to travel to take over the trial. Further, there is nothing to suggest that a substitute judge could have presided over the trial without an adjournment.

And proceeding remotely came with its own complications. True, the district court stated during the hearing that "[y]ou could have probably proceeded with me working by video, but my understanding is that the defense also has objected to DH appearing by video conference as well."

R.60, PID 521. But, as the district court explained in its order denying Thrush's motion to dismiss, "courtroom technology was ill-suited for remote appearances, as evidenced by the undersigned's reliance on courtroom staff to help conduct the hearing," and its brief remarks at the hearing "were meant to help explain the confluence of factors producing the necessity for a mistrial, not to propose an alternative path forward." R.96, PID 1505 & n.6. The district court's determination that the courtroom technology was insufficient for the court to preside over a trial remotely is a conclusion that it was uniquely equipped to make and, accordingly, is ill-suited to searching appellate review. It was not an abuse of discretion for the district court to determine that a remote trial was beyond its capabilities.

So we are left with the district court's final and most problematic decision—whether an adjournment to November 30 was feasible. Before the district court polled the jury, Thrush's counsel objected to an adjournment. The court responded by explaining that it would poll the jury as to the feasibility of an adjournment and that if the jury was not available, its "intention [was] to declare the mistrial." R. 60, Pg. ID 514. The district court then polled the jurors on their availability. Five jurors provided reasons why an adjournment until November 30 would be inconvenient. The district court did not probe the jurors in any meaningful way with respect to the credibility or severity of the inconvenience. Instead, it took at least four jurors' answers that they could not return for trial on November 30 at face value.

As a general matter, Judge Clay is correct that a district court in this situation ordinarily should conduct the inquiry necessary to make an individualized determination regarding each juror's unavailability. But Thrush's counsel agreed at the hearing that continuing the trial on November 30th was not feasible:

> MR. MCDONALD [counsel for the United States]: Your honor, it appears more than three of the jurors have conflicts with returning on November 30th from what I observed.
>
> THE COURT: Correct.
>
> Mr. MCDONALD: That means with the—even with the two—the three alternates, I don't think we have enough for a full panel, Your Honor.
>
> THE COURT: I would agree. My belief is at this point that we need to mistry the case. The Government agree or disagree.
>
> MR. MCDONALD: Government agrees based on witness—or, excuse me, jury availability to return, Your Honor . . . .
>
> THE COURT: And defense?
>
> MR. AYAR [counsel for Thrush]: Defense agrees with the mistrial, Your Honor, but our position remains with respect to the jeopardy.

R.60, PID 519-20. By first arguing against an adjournment without addressing the court's COVID-19 exposure and then answering as he did regarding juror availability, defense counsel conceded that an adjournment was not a viable option.[2] To be sure, counsel did so while preserving defendant's previously expressed position that retrial would be impermissible because the government was to blame for Henke's unavailability. However, defendant forfeited any argument that adjournment was the appropriate course rather than declaring a mistrial. And since counsel made this concession, the district court was not obliged to further explore the jurors' answers.

Were Henke's unavailability the only reason for the adjournment, we would conclude that there was no manifest necessity for a mistrial and that declaring a mistrial was an abuse of discretion that barred retrial. However, given the judge's exposure to COVID-19, an adjournment was proper and not an abuse of discretion. At that point, Thrush's objections to adjournment and agreement that an adjournment was not feasible precludes him from now arguing that the district

---

[2] Defense counsel similarly described an adjournment to November 30th as "impracticable" in Thrush's motion to dismiss. R.64, PID 542.

court should not have accepted the jurors' excuses and should have resumed the trial after an adjournment.

For these reasons, we AFFIRM.

**CLAY, Circuit Judge, dissenting.** The district court declared a mistrial over Defendant's objection based on circumstances which the district court deemed to create a manifest necessity for a mistrial. Because the district court abused its discretion in declaring a mistrial, Defendant's retrial will violate the Double Jeopardy Clause of the Fifth Amendment. I therefore respectfully dissent.

## BACKGROUND

The majority's recitation of the facts presented by this case is in many ways misleading. Hopefully, the following description of the factual background of the case will place the relevant events in proper perspective.

In August 2020, a grand jury indicted Dale Thrush on ten counts of failing to pay payroll taxes, in violation of 26 U.S.C. § 7202, and four counts of failing to file a tax return, in violation of 26 U.S.C. § 7203. In the indictment, the government identifies Thrush as the owner and operator of several automobile-related businesses and of 402 N Mission St, LLC, which provided employer-related services. The government alleges that Thrush failed to pay the IRS approximately $238,000 in payroll taxes that 402 N Mission withheld from employees' wages from 2014 to 2016. Further, the government alleges that Thrush failed to file individual income tax returns for 2013, 2014, 2015, and 2016.

Before trial, both Defendant and the government listed Donna Henke as a witness and subpoenaed her to appear. Henke was Thrush's bookkeeper at 402 N Mission and Thrush's other businesses from 2007 to 2016. The government maintained that Henke would testify that Thrush instructed her to pay third parties and personal expenses, but to withhold payroll tax payments due to the IRS. Defendant maintained that Henke was lying.

The day before trial was scheduled to begin, on November 3, 2021, Henke informed the government that she had tested positive for COVID-19 on a rapid test. At the time, Henke was fully vaccinated and asymptomatic. Because of the positive rapid test result, Henke took a COVID-19 polymerase chain reaction ("PCR") test. She advised the government that she hoped the rapid test reflected a false positive result and that she was waiting to receive the results of the PCR test. The government did not inform Defendant or the court of Henke's positive COVID-19 rapid test result.

On November 4, 2021, the court impaneled a jury. On the next day, a Friday, the court conducted the first day of the trial. The government, in its opening statement, did not refer to Henke by name, but argued that the evidence would show that Thrush tried to blame his failure to pay payroll taxes on one of his bookkeepers. In contrast, Defendant, in his opening statement, argued that the evidence would show that Henke was responsible for the failure to pay. That afternoon, the court adjourned and continued the trial to the next Monday.

Following the court's adjournment, on that same day, defense counsel inquired of the government whether it intended to call Henke as a witness on Monday. In response, the government asked Henke about her COVID-19 diagnosis and learned that her PCR test result was positive, which the government then communicated to defense counsel and the court.

On Sunday, November 7, 2021, the government moved the court for leave to present live, two-way videoconference testimony of Henke. The government proposed that Henke testify from the courthouse parking lot in a tent that the government had procured, with Defendant and defense counsel physically present at a safe distance. In the alternative, the government requested that the court permit a video deposition of Henke, with the recorded video testimony to be later shown to the jury. In response, Defendant moved to bar the government's proposal.

The next morning, in response to these motions, the court convened a hearing. In addition to addressing the parties' motions, the court informed the parties of two additional circumstances that had arisen over the weekend. First, one of the jurors had indicated that her son was sick with the flu, and she could not leave her residence as a result. Second, the trial judge's spouse tested positive for COVID-19. Though the trial judge tested negative for COVID-19 on a rapid test, he participated in the hearing by telephone because he did not believe he should enter the courthouse due to his exposure. Considering these circumstances, the court informed the parties that there were two possible courses of action: either to adjourn the case until November 30, 2021 (the next available day on the court's schedule) or to mistry the case and reschedule it for early in 2022.

The government agreed to adjourn the trial until November 30, 2021. Defendant objected to adjourning the trial and objected to a mistrial on double jeopardy grounds. To determine the feasibility of a continuance, the court polled the jurors about their availability for trial on November 30, 2021. To poll the jurors, the trial judge appeared on a video screen in the courtroom and addressed the jurors through the court audio system. Five jurors indicated that they had a conflict with a continuance to that date: Juror 3 reported that she had obstetrics testing that week; Juror 6 reported that he started a new job on November 15 and could not miss any days of work; Juror 11 reported that she had to accompany her husband to a medical appointment on November 30; Juror 12 reported that he was traveling to Mexico that week for a friend's wedding; and Juror 14 reported that she was traveling for her daughter's travel basketball games. The court made no further inquiry of the jurors about their supposed conflicts, and instead took their reports at face value.

After polling the jurors, the trial judge stated that he believed that the court "need[ed] to mistry the case." Hr'g Tr., R. 60, Page ID #520. Though there were three alternate jurors, the

court reasoned that there were not enough jurors for a full panel because, in its view, five jurors were unavailable. The government agreed on the need for a mistrial and Defendant did not object, though Defendant maintained his objection to a mistrial on double jeopardy grounds. The court clarified that the basis of the mistrial was a "confluence of factors" including Henke's positive COVID-19 test, the trial judge's exposure to COVID-19, and the impracticability of adjourning the trial because of the jurors' unavailability. *Id.* at Page ID #520–521. The next week, the court issued an opinion and order declaring a mistrial for the reasons stated on the record and denying as moot the motions regarding witness testimony.

On December 16, 2021, Defendant moved to dismiss on double jeopardy grounds. Defendant argued that the double jeopardy clause barred retrial because the government knew of Henke's positive COVID-19 rapid test before the trial began. Defendant contended that the trial could have continued without Henke's testimony with either the district judge presiding by video or a magistrate judge presiding in his place. Defendant also moved to disqualify government counsel for "dishonest and overzealous" behavior, based on their failure to disclose Henke's positive COVID-19 rapid test result. Mot. to Disqualify Prosecutors, R. 65, Page ID #548–549. The government opposed both motions.

The court denied Defendant's motion to dismiss based on its determination that manifest necessity existed for the mistrial and denied Defendant's motion to disqualify government counsel. The court reasoned that the government did not know Henke would be unavailable based on the positive COVID-19 rapid test result, given the possibility of a false negative and Henke's status as vaccinated and asymptomatic. Further, the government did not seek a mistrial but rather sought for Henke to testify via alternative means or for an adjournment. Finally, in the court's view, the trial judge's exposure to COVID-19 also supported the mistrial because it was impractical for him

to preside remotely given courtroom technology, and magistrate judges may not preside over felony trials.

Defendant timely appealed the district court's denial of his motions to dismiss and to disqualify government counsel. Defendant also moved to stay trial pending appeal. The court granted the stay pending resolution of Defendant's appeal.

**DISCUSSION**

We review a district court's denial of a motion to dismiss an indictment on double jeopardy grounds de novo. *United States v. Cameron*, 953 F.2d 240, 243 (6th Cir. 1992) (citation omitted). In this case, the district court declared a mistrial based on the impossibility of continuing the trial due to jurors' scheduling conflicts and what the district court believed to be a "confluence of factors" preventing the trial from immediately resuming. Op. and Order, R. 96, Page ID #1500. These factors included the unavailability of the witness Henke and the trial judge's possible exposure to COVID-19. The district court determined that these circumstances warranted a mistrial. Quite the contrary, the circumstances in Defendant's case, even when considered together, did not warrant a mistrial, and the trial judge improperly exercised his discretion in declaring one.

**I.     Relevant Legal Principles**

The Fifth Amendment's Double Jeopardy Clause provides that a person shall not "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This constitutional right protects against not only being punished twice, but against being placed in jeopardy twice. *Ball v. United States*, 163 U.S. 662, 669 (1896). In a jury trial, jeopardy attaches when the jury is impaneled and sworn. *Serfass v. United States*, 420 U.S. 377, 388 (1975) (citing *Downum v. United States*, 372 U.S. 734 (1963)). "[T]he prohibition against placing a defendant

twice in jeopardy reflects a constitutional policy of finality for the defendant's benefit in all criminal proceedings, and is 'fundamental to the American scheme of justice.'" *Jones v. Hogg*, 732 F.2d 53, 54 (6th Cir. 1984) (quoting *United States v. Jorn*, 400 U.S. 470, 479 (1971)). According to the Supreme Court:

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187–88 (1957). "Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Arizona v. Washington*, 434 U.S. 497, 505 (1978).

However, if a criminal proceeding is terminated without finally resolving the merits of the charges against the accused, the Clause is not an absolute bar to retrial. *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982). Where the trial is terminated over the objection of the defendant, the classical test for lifting the double jeopardy bar to a second trial is the "manifest necessity" standard first articulated by Justice Story:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes…. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

*United States v. Perez*, 22 U.S. 579, 580 (1824); *see also Kennedy*, 456 U.S. at 672. As this formulation shows, "a defendant's valued right to have his trial completed by a particular tribunal

must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689 (1949).

In *Jorn*, the Supreme Court emphasized that Justice Story's formulation in *Perez* remained the "standard of appellate review for testing the trial judge's exercise of his discretion in declaring a mistrial without the defendant's consent." 400 U.S. at 481. In that case, the trial judge *sua sponte* declared a mistrial when he determined that nonparty witnesses should have the opportunity to consult with counsel prior to giving testimony that might lead to self-incrimination. *Id.* at 473. The Court decided that the Fifth Amendment barred retrial. *Id.* at 486–87. In so holding, it reiterated that "the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Id.* at 485; *see also Fulton v. Moore*, 520 F.3d 522, 528 (6th Cir. 2008) (stating that the *Jorn* decision "turned largely on the court's finding that the trial judge acted abruptly, gave no consideration to a trial continuance, and allowed the parties no opportunity to argue or even object").

Similarly, in *Arizona v. Washington*, the Supreme Court relied on Justice Story's formulation of when a judge, in his discretion, may determine there is manifest necessity for a mistrial. 434 U.S. at 506. In that case, the trial judge declared a mistrial because defense counsel made improper and prejudicial remarks which the trial judge determined were likely to have affected the impartiality of one or more of the jurors. *Id.* at 511. The Supreme Court held that the Fifth Amendment did not bar retrial because the trial judge's assessment of possible juror bias was to be accorded a high degree of respect, and the record reflected a sound exercise of discretion. *Id.* at 511, 516. The Court reasoned that the trial judge "evince[d] a concern for the possible double

jeopardy consequences of an erroneous ruling," "gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial," and "accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding"— the trial judge did not act "precipitately," "hast[il]y," or improvident[ly]." *Id*. at 514 n.34, 515–16.

This precedent makes clear that a mistrial may not be declared without caution, deliberation, and consideration of the defendant's Fifth Amendment rights. While we accord deference to the trial court, "discretion does not equal license; the Fifth Amendment's guarantee against double jeopardy would be a sham if trial judges' declarations of 'necessary' mistrials were in fact to go unreviewed." *United States v. Sisk*, 629 F.2d 1174, 1178 (6th Cir. 1980). As to how we review mistrial declarations, the Supreme Court in *Washington* "established a 'sliding scale of scrutiny' for determining whether manifest necessity existed." *Colvin v. Sheets*, 598 F.3d 242, 253 (6th Cir. 2010) (citing *Ross v. Petro*, 515 F.3d 653, 669 (6th Cir. 2008)). At one end, the "strictest scrutiny applies when the mistrial is based on prosecutorial or judicial misconduct." *Id.* At the other end, "great deference" or "special respect" is due when the mistrial is based on a deadlocked jury. *Id.* Where a mistrial is premised on circumstances "akin to a deadlocked jury situation, (i.e., where fault is not attributed to a party, counsel or the judge)," "great deference" similarly applies and the case warrants "the most relaxed scrutiny." *Ross*, 515 F.3d at 669; *Colvin*, 598 F.3d at 253.

We determine the appropriate level of scrutiny by looking to "whether the underlying reasons for the mistrial concern issues best left to the informed discretion of the trial judge or issues that resemble pure questions of law for which closer appellate review is appropriate." *United States v. Stevens*, 177 F.3d 579, 583–584 (6th Cir. 1999). As *Perez* and its progeny intimate,

although courts are rarely to declare mistrials due to "manifest necessity," the test for doing so is a flexible one, "with reviewing courts analyzing the trial court's exercise of discretion in light of the particular facts and circumstances of each individual case." *Harpster v. Ohio*, 128 F.3d 322, 328 (6th Cir. 1997). Nonetheless, a trial judge must "temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *Washington*, 434 U.S. at 514 (quoting *Jorn,* 400 U.S. at 486).

On the sliding scale of scrutiny established in *Washington*, the appropriate level of scrutiny in this case lies between the two poles of "strictest scrutiny" and "great deference." Because no prosecutorial or judicial misconduct occurred, the "strictest scrutiny" does not apply. *Colvin*, 598 F.3d at 253. Nor, however, does "the most relaxed scrutiny" apply, *Ross*, 515 F.3d at 669, contrary to the majority's suggestion. This case is not akin to a deadlocked jury situation, where fault for the mistrial cannot be attributed to any party or counsel or the judge. *See id.* Though no misconduct occurred, the judge exercised discretion over and made judgments on matters that affected his ultimate judgment on the necessity of a mistrial—namely, the government's proposal to present Henke's testimony through alternative means, the alleged unavailability of the jurors, and the feasibility of presiding over the trial remotely.[1] As these are matters of courtroom administration, this Court should accord the district court's judgments deference, in the ordinary sense, and review for abuse of that discretion. And on the district court's ultimate declaration of

---

[1] The majority suggests that the "most relaxed scrutiny," *Ross*, 515 F.3d at 669, is warranted because the district judge's "COVID exposure" was outside the judge's and the parties' control. Majority Op. at 7–8. However, the district judge's *response* to his COVID exposure was well within his control. We review a district judge's exercise of discretion in response to circumstances, not whether the circumstances themselves were of the judge's making.

a mistrial, "reviewing courts have an obligation to satisfy themselves that, in the words of Mr. Justice Story, the trial judge exercised 'sound discretion.'" *Washington*, 434 U.S. at 514.

Having set forth the legal principles governing a trial court's application of the manifest necessity standard and the reviewing court's responsibility, I turn to whether the trial judge's conduct in this case evinced the sound discretion that precedent requires.

## II. Alternatives to Declaring a Mistrial

### 1. Immediately Continuing the Trial

Considering the circumstances of this case, the trial court's first obvious alternative to declaring a mistrial was to continue the trial immediately, or after an adjournment of one or two days. The supposed barriers to continuing the trial immediately were Henke's inability to testify in-person and the trial judge's potential exposure to COVID-19. These barriers, to the extent they were barriers at all, were far from insurmountable ones. Under the circumstances presented, the trial court could have—and should have—continued with the trial without delay, and it was error not to do so.

#### A. *Witness Henke*

Because Henke tested positive for COVID-19, she was unable to enter the courthouse to testify in-person. Given this circumstance, the government moved to present Henke's testimony to the jury through alternative means. The first method the government proposed was to present Henke's testimony through a live, two-way videoconference. Under this method, the government proposed to situate Henke in the courthouse parking lot in a tent that the government had procured, with Defendant and defense counsel physically present at a safe distance. The second method the government proposed was to present Henke's testimony through a video recording, by taking Henke's deposition in advance.

Bafflingly, the trial judge did not rule on the merits of the government's motion to allow testimony by alternative means. Instead, the trial judge declared a mistrial and then declared the motion moot. In other words, by declaring the mistrial, the trial court created the supposed mootness that justified ignoring the detailed alternative methods of presenting Henke's testimony proposed by the government. The trial court thereby abdicated its responsibility to protect Defendant's "valued right to have his trial completed by a particular tribunal." *Washington*, 434 U.S. at 503; *see also Jorn*, 400 U.S. at 485 (holding the "doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings.").

On review, I see no reason why Henke could not have provided testimony by video. Defendant objected to any form of testimony other than in-person testimony in the courtroom based on his right under the Confrontation Clause of the Sixth Amendment. However, the right to confrontation is not absolute. *See Maryland v. Craig*, 497 U.S. 836, 850 (1990) (holding a witness's physical presence in the courtroom is not required to satisfy a defendant's right to confront an accusatory witness if the witness's physical absence "further[s] an important public policy" and "the reliability of the testimony is otherwise assured"); *see also United States v. Benson*, 79 F. App'x 813, 820–821 (6th Cir. 2003) (affirming the district court's decision to allow an elderly witness who was too ill to travel to testify via video conference). The Supreme Court has articulated the reasons underlying the right to confrontation, which include: (1) the giving of testimony under oath, (2) the opportunity for cross-examination; (3) the ability of the factfinder to observe demeanor evidence; and (4) the reduced risk that a witness will wrongfully implicate an innocent defendant. *Craig*, 497 U.S. at 845–846.

The government proposed a method by which Defendant could have been physically present with Henke in a temporary structure in the courthouse parking lot while she testified and while defense counsel cross-examined her, with her testimony being broadcast by video to the jurors in the courtroom. This arrangement would have preserved all the characteristics of in-person testimony: Henke would have been sworn; she would have been subject to full cross-examination; she would have testified in full view of the jury and the court; and she would have given her testimony in the physical presence of Defendant and his counsel. *See Benson*, 79 F. App'x at 821 (citing *United States v. Gigante*, 166 F.3d 75, 80 (2d Cir. 1999). Since this arrangement would have subjected Henke to "testing in the crucible of cross-examination," *see Crawford v. Washington*, 541 U.S. 36, 61 (2004), it would not have violated any of Defendant's rights.

On appeal, Defendant argues that even if Henke were unable to testify, such unavailability would not support a mistrial because the government knew she had tested positive for COVID-19 before the trial, and failed to inform defense counsel or the trial court, and therefore the government assumed the risk that she would be unable to testify. Defendant relies on *Downum v. United States*, 372 U.S. 734 (1963), which provides that the Double Jeopardy Clause bars a second prosecution if a prosecutor proceeds to trial aware that a key witness is not available to give testimony and a mistrial is later granted for that reason. *Id.* at 737; *see also Washington*, 434 U.S. at 508 n.24. On this point, the majority agrees with Defendant. I am similarly troubled that the government knew that Henke had received positive a COVID-19 test result before the trial began but made no effort to inform defense counsel or the trial court. Therefore, though I conclude Henke was not strictly unavailable to testify because she could have testified by video, I agree with the majority that the circumstance of Henke's positive COVID-19 test result provided no ground for a mistrial.

As a last resort, if the trial judge were unwilling or unable to make alternative arrangements for Henke's testimony, the trial judge should have permitted the trial to proceed without Henke as a witness. It is not unusual that a witness' attendance at trial may not be obtainable due to the witness' unavailability—for any number of reasons. When a witness is not available, barring unusual circumstances not present here, the trial court normally proceeds without the witness. This is especially so in a case such as this, where the witness was not unavailable due to any action of the Defendant and where the government chose to proceed to trial knowing that the witness might be unavailable.

B.      *The Trial Judge*

Similarly, the trial judge's potential exposure to COVID-19 provided no ground for a mistrial. At the November 8, 2021 hearing, the trial judge informed the parties that his spouse had tested positive for COVID-19 the day before. The trial judge himself tested negative for COVID-19 on a rapid test. But based on his exposure to his spouse, the trial judge stated that he did not think he should enter the courthouse "until [he] had at least a day or so of" negative test results. Hr'g Tr., R. 60, Page ID #510. In relying on his potential exposure to COVID-19 as a ground for declaring a mistrial, the court stated that "courtroom technology was ill-suited for remote presiding, as evidenced by the undersigned's reliance on courtroom staff to help conduct the hearing." Op. and Order, R. 96, Page ID #1505. Further, the court noted that a magistrate judge could not preside over a felony trial.

To start, the record reveals little about the true extent of the trial judge's unavailability to preside in-person at the trial. At the time the court decided to declare a mistrial, the trial judge had taken only a rapid COVID-19 test, which returned a negative result. The record contains no indication that the trial judge ever received a positive COVID-19 test result. At the very least, the

- 25 -

trial judge could have briefly deferred his decision as to a mistrial until he received the results from the more reliable COVID-19 PCR test. This would have dispelled the uncertainty over whether the trial judge could permissibly enter the courthouse and preside over the trial in-person. Though the government states that the COVID-19 protocols then in effect barred the trial judge's entrance to the courthouse due to his exposure to COVID-19, the protocols are silent on whether the trial judge could have permissibly entered the courthouse after receiving a negative COVID-19 PCR test result, despite his claim of prior exposure.[2] It is a reasonable possibility that had the trial judge received a negative COVID-19 PCR test result, he, in consultation with the chief judge of the Eastern District of Michigan, could have been permitted to enter the courthouse to preside in-person over the trial. Though the majority disagrees, it would have been entirely appropriate for the district judge to seek the guidance and assistance from the chief judge in these circumstances.

Even were the trial judge unable to enter the courtroom because of COVID-19—which is not established on this record—the trial judge could have presided over the proceedings remotely, inasmuch as the record does not indicate that the trial judge was suffering from any adverse symptoms due to COVID-19.

In the order denying Defendant's motion to dismiss, the trial judge summarily stated that "the courtroom technology was ill-suited for remote appearances." Op. and Order, R. 96, Page ID #1505. As evidence, the trial judge pointed to his "reliance on courtroom staff to help conduct the hearing" on November 8, 2021. *Id.* But the trial judge's remote presiding on that day supports

---

[2] Alternatively, the trial judge could have entered the courtroom to resume the trial after placing the trial on hold for a few days and continuing to receive negative COVID-19 test results. (The Eastern District of Michigan's policy was less than clear, stating that anyone "exposed within the last ten days" to COVID-19 was not permitted to enter the courthouse, but the policy failed to state the length of time into the future that an "exposed" person was not permitted to enter the courthouse.)

the opposite conclusion. At the hearing, the trial judge appeared on a video screen, spoke to the jurors, and listened to the jurors' responses through the courtroom's audio system. Far from showing the limits of courtroom technology, the trial judge's remote appearance at the hearing proved its basic functionality. As to the trial judge's reliance on courtroom staff to appear remotely, there is no reason why the courtroom staff could not have assisted with the trial judge's remote appearance at the trial. Surely, facilitating a trial is a proper use of the courtroom staff's time.

Finally, even if the trial judge could not have presided remotely—which he could have—he could have sought substitution of another district judge to preside over the trial in-person. The Federal Rules of Criminal Procedure specifically provide for substitution in the event of a trial judge's disability. Rule 25 states that, during trial, "[a]ny judge regularly sitting in or assigned to the court may complete a jury trial if (1) the judge before whom the trial began cannot proceed because of death, sickness, or other disability; and (2) the judge completing the trial certifies familiarity with the trial record." Fed. R. Crim. P. 25(a).

In this case, the court did not raise to the parties substitution of judges as a possibility, and made no effort to discover whether another district judge was available to preside over the trial. The trial occurred in the Eastern District of Michigan, to which twenty district judges are assigned. These judges' respective duty stations are all less than 120 miles from the courthouse in Bay City at which the trial occurred, or within a two hours' drive, and some of the judges may live significantly closer to Bay City. However, the trial judge made no effort to inquire regarding their proximity to the trial location or their willingness or availability to attend a trial in that location. It is hard to fathom that the trial judge (with the aid and assistance of the district's chief judge)

could not have identified a single district judge out of the twenty to preside over the trial in his stead.

Further, the trial had only seen a single day of testimony, and the issues to be presented in Defendant's case were neither novel nor so complex that a substitute judge could not have quickly grasped them. *See Cameron*, 953 F.2d at 245 (citing *United States v. Sartori*, 730 F.2d 973, 976 (4th Cir. 1984)). Each district judge is well-versed in the Federal Rules of Evidence and Criminal Procedure and would have been fully capable of stepping in to assist under these less than ideal circumstances.

Though a district court "need not exhaustively consider all possible alternatives before finding 'manifest necessity' for a mistrial," *Ross*, 515 F.3d at 669, the court erred by not considering substitution of another district judge to preside over the trial, as provided for in Rule 25. Given the trial judge's failure to explore the substitution of another judge, and failure to wait the minimal time necessary to gain clarity about the status of his possible exposure to COVID-19, the trial judge's claimed possible exposure to COVID-19 provided no ground for a mistrial.

### 2. Briefly Adjourning the Trial

Even had the trial court stopped the trial—which, for the reasons discussed above, the court had no basis to do, and should not have done—the trial court had a second obvious alternative to a mistrial, which was to continue the trial to the later date of November 30, 2021. The imminent possibility of such a continuance underscores the trial judge's improper exercise of discretion in declaring a mistrial. To start, a continuance to this later date may well have allowed time for Henke's COVID-19 infection and concerns about the trial judge's potential COVID-19 exposure to resolve. Thus, it is entirely possible that Henke would have been available to testify in-person in the courtroom and the trial judge would have been available to preside in-person. With these

supposed barriers out of the way, the only reason that remains to explain why a continuance would have been impossible is the trial court's finding that an insufficient number of jurors would be available. Given the trial judge's deficient examination of the jurors' purported reasons for their unavailability on November 30, 2021, the district court's finding lacks sufficient merit to deserve to be credited.[3]

As a general matter, a district court has the power to excuse "any person summoned for jury service . . . upon a showing of undue hardship or extreme inconvenience." 28 U.S.C. § 1866(c)(1). Examples of "undue hardship or extreme inconvenience" are "great distance, either in miles or traveltime [sic], from the place of holding court" or "grave illness in the family" or other emergency. *Id.* § 1869(j). Corresponding with this statutorily provided power is an obligation on the part of the trial court to verify that a genuine basis for the asserted hardship exists through inquiry of prospective jurors. *See Cleveland v. Cleveland Electric Illuminating Co.,* 538 F. Supp. 1240, 1256–57 (N.D. Ohio 1980) (finding that absent agreement of the parties, a court should consider hardship requests individually and not merely grant the request of every person who asserts that jury service in a protracted trial would cause personal hardship).

The record shows that the trial judge did not carefully consider or interrogate the jurors with respect to their responses. The concerns about employment and family obligations that the jurors reported to the trial court are commonplace ones, as jury service is often inconvenient for the citizens who are called upon to perform it. *See Thiel v. S. Pac. Co.*, 328 U.S. 217, 224 (1946) ("Jury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a

---

[3] Because there were three alternative jurors available, the district judge presumably only needed to identify two jurors who could continue with the trial out of the five who claimed that they were unavailable in order to continue with the trial.

plea of inconvenience or decreased earning power."). Other than inquiring generally about the jurors' availability, the court did not conduct any further inquiry that might have revealed whether these jurors could have shown "undue hardship or extreme inconvenience" that would have justified their excusal from the proceedings.

In the end, the district court failed to make any individualized determination of juror unavailability. Rather, the district court stated generalities about the unavailability of the jury as an entity. Accordingly, the district court made no factual findings about juror unavailability which this Court may review on appeal.[4]

The district court's failure to conduct further inquiry, or to make individualized determinations of unavailability for each juror, would have been improper in selecting jurors in the first instance. However, in this case, the court was not selecting jurors in the first instance. Rather, the court had already screened the prospective jurors and impaneled a jury of those of whom it approved. Because the jurors had been selected to serve on the case, and had served for a full day of trial, the court bore additional responsibility to scrutinize the jurors' requests to be excused. This was especially so because granting more than three of the requests would require the court to discharge the jury. If a court discharges a jury when further proceedings may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a

---

[4] The majority mischaracterizes the dissent's position with respect to this issue as stating that "a district court in this situation ordinarily should conduct the inquiry necessary to make an individualized determination regarding each juror's unavailability," and then proceeds to argue that the district court was not so obliged in this case because of defense counsel's supposed "concession" that adjournment was not feasible. Majority Op. at 10–11. Respectfully, the dissent contains no such general admonishment about a district court's duty in "ordinary" circumstances. Rather—under the facts and circumstances of this case, and regardless of Defendant's position on the issue—the district judge failed to fulfill his responsibility to conduct the proper individual inquiry with respect to each of the five jurors before the court.

particular tribunal." *Washington*, 434 U.S. at 509. The court seemingly failed to pay heed to this legal principle in its treatment of the jurors' purported conflicts.

The majority claims that Defendant waived or forfeited this issue, based on the following exchange:

> MR. MCDONALD [counsel for the United States]: Your honor, it appears more than three of the jurors have conflicts with returning on November 30th from what I observed.
>
> THE COURT: Correct.
>
> Mr. MCDONALD: That means with the—even with the two—the three alternates, I don't think we have enough for a full panel, Your Honor.
>
> THE COURT: I would agree. My belief is at this point that we need to mistry the case. The Government agree or disagree?
>
> MR. MCDONALD: Government agrees based on witness—or, excuse me, jury availability to return, Your Honor.
>
> THE COURT: And defense?
>
> MR. AYAR [counsel for Thrush]: Defense agrees with the mistrial, Your Honor, but our position remains with respect to the jeopardy.

Hr'g Tr., R. 60, Page ID #519–520. The majority attempts to argue that defense counsel thereby agreed to a mistrial, but leaves out that counsel's agreement was coupled, immediately following, with a reiteration of Defendant's position with respect to double jeopardy. Accordingly, Defendant never relinquished his position that declaring a mistrial would bar his retrial.

The principles of forfeiture and waiver facilitate appellate review by having a district court address all issues and arguments in the first instance. *See Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1007 (6th Cir. 2009). I am at a loss to understand how these principles apply in this case. The issue of juror unavailability was the sole matter the district court considered to inform its decision whether to adjourn the trial. Once the district court had stopped the trial, whether to adjourn the trial or to declare a mistrial—to which Defendant steadfastly objected on double

jeopardy grounds—turned on the key inquiry of whether the jury was unavailable at the later date. Accordingly, the district court squarely considered—and then ruled on—this issue. The district judge should not be given a pass for simply ruling on the issue poorly—on the basis of forfeiture or waiver when these concepts do not apply under the circumstances.

In truth, Defendant's motive is not difficult to divine. Defendant maintained a consistent position throughout—he objected to a mistrial on double jeopardy grounds. Having established this position, stopping the trial would have benefited Defendant because it would have ended the jeopardy Defendant was in and created a double jeopardy bar to future prosecution. Accordingly, defense counsel cannot be faulted for asserting positions consistent with stopping the trial. Rather, the district court must be relied on to persevere in protecting a defendant's "valued right to have his trial completed by a particular tribunal," *Wade*, 336 U.S. at 689, "until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Jorn*, 400 U.S. at 485. When a defendant objects, we expect the district court to overrule or sustain the objection on its merits, and not merely resign itself to the defendant's wishes, as the district judge did here.

On this record, the court was without basis to conclude that a critical number of the jurors would have had to be excused and that therefore there would be an insufficient number of jurors for a continuation of the trial. Thus, it was not adequately established on the record that there was a credible reason why the trial could not have continued on November 30, 2021. For this additional reason, the district court erred in declaring a mistrial.

**CONCLUSION**

The magnitude of the COVID-19 pandemic and the disruption it caused to our national life is well-recognized. Some of the measures considered herein—including hearing witness testimony from a tent and substituting the trial judge—constitute extreme procedures which only extraordinary circumstances justify. However, the exercise of sound discretion, while conducting a trial under the extraordinary circumstances presented by the COVID-19 pandemic, called for the consideration and application of creative solutions which would preserve a defendant's right against being twice placed in jeopardy, a right fundamental to our scheme of justice. *Jones*, 732 F.2d at 54.

On examining the circumstances surrounding the discharge of this jury, it seems abundantly apparent that the trial judge made no effort to exercise sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the declaration of this mistrial. Therefore, it is patently obvious that, in the circumstances of this case, Defendant's retrial will violate the Double Jeopardy Clause of the Fifth Amendment. I therefore respectfully dissent.